Millard L. Medonick, S.
A previous opinion having been written (69 Misc 2d 942) in connection with the motion to dismiss this proceeding on the ground that section 384 of the Social Services Law is unconstitutional in that its provisions violate *952 the procedural and substantive constitutional rights of a natural mother, and that motion having been denied, and a hearing on the issue of abandonment of this infant having been held on May 2 and 4, 1972, and decision having been reserved on the issue of abandonment, this decision and opinion are now made to resolve the issue.
The issues raised are:
(a) whether this mother by her acts or failure to act, has in fact abandoned this child born on October 13, 1966, even though she has never signed a surrender in writing, and even though she now urges that the child be given to her custody for the first time in its more than five years of life;
(b) whether the Bureau of Child Welfare and the SpenceChapin Adoption Service have made diligent efforts to strengthen the parent-child relationship and whether such efforts are necessary or can be dispensed with; and
(c) whether uprooting this child from the foster home in which she has spent substantially all her life would be a denial of her constitutional right to due process of law even assuming that the Bureau of Child Welfare and Spence-Chapin failed to make diligent efforts to strengthen the parent-child relationship for approximately one year after the birth of the child.
While some of the evidence is in conflict, I make the following findings of fact based on my evaluation of the credible evidence.
The respondent mother is about 35 years old, she has never been married, she has given birth to four children (the girl involved here is the fourth) and is pregnant with a fifth. She has custody of her son, age 11 and her daughter, age 8, who seem to be (without any evidence in depth), adequately cared for by her. Tyrone, one of her children (her third) died at the age of 11 days, apparently due either to her neglect or abuse. She has been supported by public assistance from the Department of Social Services substantially throughout her residence in New York State which began approximately in 1958. Most of her New York State residence has been in the County of New York but she has recently moved to Beacon, New York.
While in the County of New York she gave birth to a boy in November, 1964, who, although a full term healthy baby, died about 11 days after it was born. I find that this child died of head injuries suffered in this mother’s own home in her custody, under circumstances which suggest either child abuse by the mother, or, at least, gross neglect on her part. The contemporaneous records show that she admitted leaving this newly-born child unattended while she was shopping for groceries. Her son’s death in 1964, indicates, at least, serious inadequacy in *953 the judgment of the respondent mother on how to care for a child. However, had there been no such child or death, the finding of abandonment of Jennifer would be the same.
Jennifer was born on October 13, 1966. Some days before her birth her mother, Helen “ S ”, indicated to a social worker at St. Luke’s Hospital that she wished that the child be placed for adoption. Shortly after Jennifer was born, her mother signed a form authorizing her commitment to foster care. Her mother continued to indicate, both to the Bureau of Child Welfare and to the Spence-Chapin Adoption Agency that she wanted this child adopted. (The mother testified at the hearing that she never indicated that she wanted Jennifer to be adopted, but she is not a credible witness and I do not believe her testimony on this question.)
Although Helen “ S ” was immediately informed of Jennifer’s placement with the Spence-Chapin Agency, she made no attempt to contact the agency or to communicate with Jennifer. In fact, over the entire course of Jennifer’s life no contact with any agency concerned with this child was ever initiated by the mother. All contact was made by the agencies involved, and there was usually great difficulty in getting the mother to respond at all to agency inquiries. The mother repeatedly failed to appear for scheduled appointments without notifying the agencies that she would not be coming. These appointments were arranged by the Spence-Chapin Agency to allow Miss “ S ” to participate in planning for Jennifer’s future. She did not answer mail from the Spence-Chapin Agency; she testifies that she never received any mail, but this testimony is not credible. In one instance she actually signed a return receipt for a letter that she says (in her testimony) she never received.
In April of 1970 (the child being then 3% years old), in a phone conversation with a social worker from the Spence-Chapin Agency, this mother, for the first time indicated that she desired the return of her daughter, Jennifer. But even then she insisted that Jennifer could not be returned to her unless and until she could find a larger apartment. This condition, which was set by the mother herself, was not fulfilled. In fact, over a period of some months, the mother made no efforts to find a new apartment except for clipping some listings from newspapers. She never made any efforts to follow up by visiting or even calling about these listed apartments.
Even after she indicated that she wanted Jennifer returned, Miss “ S’s ” history of broken appointments and unavailability continued. In one instance, a social worker from Spence-Chapin made a home visit to the mother because it had become obvious *954 that this was the only effective way to contact her. When the worker arrived, she was denied entry to Miss “ S’s ” home, even though it was evident from the sounds coming from the apartment that this mother was at home.
It was explained to this mother that she must make mother visits to Jennifer before the child could be returned, but Miss “ S ” refused to visit the agency for this purpose even when she was offered carfare to do so.
I find that during the five-and-a-half years of Jennifer’s life her mother never made any effort to contact or visit Jennifer, or the agency in whose custody she had been placed. No presents, cards or communications were ever sent from mother to child and no visits were ever made. The only indication that this mother desires the return of her child is her naked statement to that effect. She has never performed any act that would tend to insure the return of Jennifer to her until her recent move to Beacon, although numerous opportunities for such action were afforded to her. Instead, while insisting that she wants the child returned, she has placed more obstacles between herself and this child, by setting her own condition for the child’s return and taking no action to fulfill this condition. I therefore find that Jennifer is an abandoned child within the meaning of sections 371 and 384 of the Social Services Law.
These facts also substantiate an independent finding that this mother is unfit to assume custody of this child. Because of the respondent’s long continued course of conduct, this child has grown to love her foster parents permanently, never her mother, and so the mother has become unfit to have custody of this child. A clear case has been established of permanent love and affection having become stronger than the ties of a mere blood relationship.
In a recent decision, Judge Polieb of the Family Court held that due process requires that the procedural safeguards provided to parents in article 6 of the Family Court Act (which deals with permanent neglect) also must be afforded to parents in abandonment proceedings under the Social Services Law. (Matter of Ellick, 69 Misc 2d 175,179.)
Turning to substantive due process, and to resolve the issue of law posed in my prior opinion in this case on the motion to dismiss, I now hold that the requirement that the custodial agencies make diligent efforts to encourage and strengthen the parent-child relationship, except when detrimental to the welfare of the child, found in sections 611, 614 and 622 of the Family Court Act, must be read into the definition of an abandoned *955 child as one who has been ‘ ‘ abandoned or deserted in any place by both parents, or by the parent having its custody * * * and left * * * without being visited * * * for a period of at least six months * * * without good reason ”. (Social Services Law, § 371, subd. 2; emphasis supplied.) Such a reading of these statutes, which both deal with the permanent severance of parental rights to custody of a child, is necessary to afford parents substantive due process.
However, I also indicated and now hold, that children too have a right to the protection of due process of law, and that a combination of parental abandonment and agency failure to promote the parent-child relationship cannot override the substantial best interests of an innocent child, under both section 384 of the Social Services Law and sections 611, 614 and 622 of the Family Court Act. The failure of any child-caring agency, public or private, to perform its duties cannot excuse the abandonment of the natural parent if such a long period of time has passed that removing the child from its foster-adoptive home will result in serious emotional trauma. The primary right to be protected by the courts and the Legislature is the right of the child to a permanent and stable home, if the child has acquired one. If the child does not have such a home, then the principles of diligent efforts to strengthen the blood ties with the parent would apply, when such efforts will not be detrimental to the moral and temporal welfare of the child. (Family Ct. Act, §§ 611, 614.) In this case, such efforts were begun 11 months after the child was born, but the mother did not respond to them.
I find as a matter of fact that for a period from November 14, 1966 to September 14, 1967, there was a total lack of effort on the part of Spence-Chapin or the Bureau of Child Welfare to contact this mother to seek to strengthen the parent-child relationship. Apparently, this hiatus was due to a misunderstanding between these two agencies, each assuming that the other was in contact with the mother. But Jennifer has lived in her present foster home for almost five years, since July of 1967. This is essentially the only home she has ever known, and to take her from it now would most assuredly have serious adverse emotional effects on this child. (See Erickson, Personality in Nature Society and Culture [1955]; Cecil, A Child Divided [1966]; Bowlby, Attachment and Loss [1969]; A. Freud, Psychoanalytic Study of the Child [1955].)
Therefore, I hold that although there was a period during which the agencies involved failed to fulfill their duties, the abandonment by this mother went on for such a prolonged period *956 that it cannot be excused by these agencies’ failures. Any other result would be contrary to the best interests and constitutionally protected rights of this child.
While unnecessary to the finding of abandonment, it should be noted that about two years of delay were caused by false statements by the respondent mother to Spence-Chapin, that she had a husband who was the father of Jennifer. Investigation in three States proved no marriage ever existed. There is no proof that this alleged husband ever supported or lived with the child. Such investigation of purported marriage is said to be required by rule of the Department of Social Services despite a lack of documentary proof from the mother and despite her own contrary indication by placing no father’s name on Jennifer’s birth certificate. I strongly urge that such a rule, if it exists, be changed to avoid false leads and unnecessary delays in cases like this.
Jennifer is found to be an abandoned child, and the custody and guardianship of her person is committed to the SpenceChapin Adoption Service. The Spence-Chapin Adoption Service is authorized to consent to an adoption of this child by a suitable person or persons, subject to the customary approval and decree of the Surrogate’s Court, and the consent of Helen “ S ”, the mother of this child, to such an adoption is dispensed with.
Submit decree on notice.