OPINION OF THE COURT
Elrich A. Eastman, J.
In this termination of parental rights proceeding pursuant to section 384-b of the Social Services Law, petitioner, the Catholic Guardian Society, alleges abandonment as the ground for termination of parental rights of the putative father (Daniel R.) and mental illness and/or mental retardation as the grounds for termination of parental rights of the mother (Ana Victoria O.).
The respondent mother is a 27-year-old Puerto Rican who emigrated to the United States in 1970 with her common-law husband, Daniel R. She is uneducated and illiterate. Since her entry into the United States, she has received public assistance benefits.
Three children were born to the respondent and Daniel R. Juanita, born on June 24, 1971, died 36 days later from an allergic reaction to milk, Ana Maria, the subject of this proceeding, was born on October 19, 1973. A third child, Emilia, was stillborn on July 7, 1974.
She and Daniel R. separated in April of 1975, and he has had no further contact with her or the infant, Ana Maria.
In May of 1975, the respondent began living with Salvatore V. They have two children, Alejandro, born on March 1, 1976, and Magali, born on February 25, 1977.
The respondent mother has been involved in various Family Court proceedings since 1975. On April 29, 1975, a finding of neglect was made against her former common-law husband, Daniel R. (Docket No. N-1519/75.) This proceeding had been transferred from the criminal court, where the respondent mother had filed a complaint alleging that Daniel R. had burned the infant Ana Maria’s leg with a hot iron. The infant was hospitalized for treatment. As a result of the incident, the respondent mother was given an order of protection against Daniel R., who had a history of alcohol abuse and physical *912 abuse of both the respondent mother and the infant. It was during this period that the respondent mother and Daniel R. separated. He has had no further contact with her or the infant, Ana Maria.
At a dispositional hearing on October 7, 1975, Ana Maria was released to the respondent mother under supervision of the Bureau of Child Welfare.
Shortly thereafter, on October 21, 1975, an abuse petition was filed against the respondent mother. (Docket No. 4219/75.) On October 24, 1975, Ana Maria was remanded to the Commissioner of Social Services. Subsequently, this petition was amended on April 15, 1976 to include Salvatore V., her present paramour, as a respondent. Like her former common-law husband, Daniel R., Salvatore V. has a history of alcohol abuse. On this date, a neglect proceeding concerning Alejandro was commenced. (Docket No. 906/76.) A finding of neglect as to Ana Maria and as to Alejandro was made against the couple on October 13, 1976. By order of disposition on this date, Ana Maria and Alejandro were placed with the Commissioner of Social Services.
Another neglect proceeding was commenced against the respondent mother and Salvatore V. (Docket No. 810/77.) A finding of neglect was entered on June 22, 1978, and the subject of the proceeding — their youngest child, Magali — was placed with the Commissioner of Social Services. Presently, Magali, along with his sibling Alejandro and half-sibling Ana Maria are in shelter care with the petitioner.
John Fist, a social worker for the Catholic Guardian Society, testified on behalf of the petitioner. According to Mr. Fist, the respondent mother last visited Ana Maria in January, 1977. After this visit, this court terminated visitation by the respondent mother and directed the agency to free the child for adoption.
Medical testimony was adduced from Dr. Jay K. Robbins, a court-appointed psychiatrist, and Beatrice Zasofsky, a court-appointed psychologist with the Mental Health Services. The testimony of Ms. Zasofsky was challenged on the ground that Ms. Zasofsky is not a "certified psychologist” as required by statute. (Social Services Law, § 384-b, subd 6, par [e].) Although Ms. Zasofsky is a licensed school psychologist, she is not a "certified psychologist” as defined in section 7603 of the Education Law.
Dr. Robbins, the court-appointed psychiatrist, examined the *913 respondent mother on two occasions, August 9, 1978 and September 19, 1978.
At the first interview he had no outside information about the respondent mother’s history. He had, however, reviewed a report prepared on January 3, 1978 by Bernard Newman, a senior psychologist with the Mental Health Clinic of Family Court. At the second interview he had additional information concerning the respondent mother’s history. Essentially, the findings of Dr. Robbins indicate that the respondent mother is suffering from mild to borderline mental retardation associated with environmental deprivation. He found no mental disorder and attributed her intellectual level to "severe sociocultural deprivation rather than true mental retardation.” He concluded that her mental condition did not fall within the purview of paragraph (c) of subdivision 4 of section 384-b of the Social Services Law. His impression is that "she could function as a mother, given the proper supportive services and guidance.”
According to the court-appointed psychologist, Beatrice Zasofsky, the respondent mother functions within the mental defective level of intelligence. She stated that the test scores of the respondent mother are: full-scale I.Q., 50; verbal scale I.Q., 55; and performance scale I.Q., 50. Noting that this test (WAIS) was culturally biased, she stated that it may not be reliable in measuring I.Q. of persons of foreign background. In conclusion, her report stated that the respondent mother "has untapped resources which could develop, if given adequate support and directions. It is quite possible that with such help and supervision she could possibly take care of her children.”
It should be noted that both Dr. Robbins and Ms. Zasofsky conducted their examinations through a Spanish interpreter because the respondent mother speaks little English.
Dr. Sandra Kaplan, a psychiatrist, and Dr. Julio Villena, a certified psychologist, testified in behalf of the petitioner. Both witnesses, at the request of the Law Guardian, had examined the respondent mother and submitted reports in a prior neglect proceeding.
Dr. Kaplan interviewed the respondent mother on November 21, 1977. She found the respondent mother suffering from schizophrenia and mental retardation. Dr. Kaplan testified that the respondent mother’s condition was nonprogressive and did not improve with time. Unequivocally, she stated that *914 the infant would be in danger of neglect if returned to the mother because of her mental condition.
Dr. Julio Villena, a certified psychologist, testified that he conducted his testing of the respondent mother in Spanish. Test results revealed mental retardation based on a full scale I.Q. of 62, a verbal I.Q. of 59 and a performance I.Q. of 72. In his report, Dr. Villena writes: "Her practical and social judgment was marked by deficiency. Her logical reasoning, even though defective, was not as impaired as other functions involving cultural or emotional factors.”
Two reports prepared by Bernard Newman, a senior psychologist with the Mental Health Clinic of the Family Court, present conflicting recommendations. The first report, dated June 26, 1975, was prepared without an examination of the respondent mother and was based solely upon information provided to him by the Bureau of Child Welfare worker. He concurred with the Bureau of Child Welfare recommendation that the child (Ana Maria) be placed because the infant was "in danger of failing to develop emotionally and intellectually.” The court notes that the child was returned to the respondent mother by the court on October 7, 1975.
In his second report, dated January 3, 1978, prepared for the neglect proceeding under Docket No. N810/77, he interviewed the respondent mother. He found she was functioning on a borderline level of intelligence. This time he noted that "[tjhere is no evidence, however, that she does not care for and does not have appropriate emotional feelings for her children”. Continuing, he advised that "[ujnless there is very strong and definitive evidence that Ms. O. is incapable of caring for and giving appropriate concern for her children, it is recommended that the children be returned to her.”
As its last witness petitioner called the respondent mother. Stoical in appearance, she testified in a confused and contradictory manner. For example, she was unable to state her correct age or the ages of her children. When questioned about her separation from Daniel R, her former common-law husband, she stated at one time she left him and at another he abandoned her.
At issue here is the question of whether or not the parental rights of the putative father, Daniel R, should be terminated on the ground of abandonment and on the grounds of mental illness and/or mental retardation in the instance of the mother, Ana Victoria O.
*915 At the outset, it is noted that the respondent putative father (Daniel R.) has defaulted in appearing and answering. Since he left the mother’s home in 1975, he has not supported or contacted the family. Therefore, after inquest, the court finds by a fair preponderance of the evidence that petitioner has sustained the allegation of abandonment. (Social Services Law, § 384-b, subd 5, par [a]; see, also, Matter of Ellick, 69 Misc 2d 175; Matter of Jennifer S, 69 Misc 2d 951.) Accordingly, the parental rights of respondent, Daniel R., to the infant, Ana Maria R., should be terminated.
Turning to this young respondent mother who has evinced a strong desire to be reunited with her children, the court must determine whether or not the petitioner has sustained the allegations of mental illness and/or mental retardation by the requisite quantum of proof. Stated more succinctly, should the parental rights of this mother be permanently terminated on the basis of her mental condition.
The criteria for termination on the basis of mental illness or mental retardation are set forth in section 384-b (subd 4, par [c]) of the Social Services Law: "The parent or parents, whose consent to adoption of the child would otherwise be required in accordance with section one hundred eleven of the domestic relations law, are presently and for the foreseeable future unable, by reason of mental illness or mental retardation, to provide proper and adequate care for a child”. "Mental illness” is defined in paragraph (a) of subdivision 6 of section 384-b of the Social Services Law, and "mental retardation,” in paragraph (b).
The legal sufficiency of the proof in a proceeding upon the grounds of mental illness or mental retardation shall not be determined until the Judge has taken the testimony of a physician and a certified psychologist or a psychiatrist in accordance with paragraph (e) of subdivision 6 of section 384-b of the Social Services Law. (Social Services Law, § 384-b, subd 6, par [c].) Paragraph (e) mandates that the "judge shall order the parent to be examined by, and shall take the testimony of, a [court-appointed] physician and a certiñed psychologist, in the case of a parent alleged to be mentally retarded, or of a [court-appointed] psychiatrist, in the case of a parent alleged to be mentally ill.” (Emphasis added.)
A finding of mental illness or mental retardation must be based upon clear and convincing proof. (Social Services Law, § 384-b, subd 3, par [g].)
*916 Adoptions, and consequently proceedings to free children for adoption, were unknown at common law. (Matter of Malpica-Orsini, 36 NY2d 568, 570; Matter of Anonymous [St. Christopher’s Home], 40 NY2d 96, 101.) These are purely statutory matters. Statutes in derogation of common law must be strictly construed. (McKinney’s Cons Laws of NY, Book 1, Statutes, § 311.) Here, this burden of strict compliance has not been met. The statute (Social Services Law, § 384-b, subd 6, par [e]) requires the testimony of a court-appointed physician and a court-appointed certiñed psychologist, in the case of a parent alleged to be mentally retarded. There has been no testimony of a physician offered on the issue of mental retardation. Furthermore, the court-appointed psychologist, by her own admission, is uncertified. Although the psychologist who testified on behalf of the petitioner is a certified psychologist, his testimony does not fall within the purview of an independent, disinterested psychological appraisal. (Cf. Matter of Corbett, 82 Misc 2d 820, 822-823.)
For the afore-mentioned reasons, this allegation must be dismissed without prejudice to the petitioner’s renewal upon proper compliance with the relevant statutory procedure.
Without passing on the merit of the allegation of mental retardation, the court would, however, comment on an issue raised by counsel for the respondent, namely, I.Q. tests as an important consideration in determining mental retardation. Counsel for the respondent urges that standardized intelligence tests are culturally biased, and there is ample support for his contention. For example, in an article entitled Termination of the Parent-Child Relationship: Should Parental I.Q. Be an Important Factor? (1973, Law and the Social Order, vol 4, pp 855, 865), the author, Keith E. Galliher, Jr., contends that "[sjocially and culturally disadvantaged people, on the average, score lower on standardized I.Q. tests than do their middle-class counterparts (Footnote omitted).” This contention, in part, was substantiated by the court-appointed psychologist, albeit uncertified, who also testified that the test given to the respondent mother is culturally biased and "may not be a reliable measure for people of foreign background, particularly persons of primitive backgrounds who have little, if any, education.” She also stated that the necessity of using a Spanish interpreter undoubtedly affected the scores. In the previously mentioned article, the author concludes: "Thus, while a careful analysis of all relevant variables will more *917 accurately indicate parental quality, the parent’s score on a standardized I.Q. test should be given very little weight in a parent-child termination proceeding.” (Note, Termination of the Parent-Child Relationship: Should Parental I.Q. Be an Important Factor?, 1973 Law and the Social Order, vol 4, p 873.) Again, this contention is supported by the testimony of the court-appointed psychologist. She concluded her testimony by noting: "However, clinically one gets the impression that Ms. O. has untapped resources which could develop, if given adequate support and directions. It is quite possible that with such help and supervision she could possibly take care of her children.” Finally, standardized intelligence tests have been subjected to strong constitutional attack as discriminatory against Blacks and Spanish-speaking people. (See Chance v Board of Examiners, 458 F2d 1167; Larry P. v Riles, 343 F Supp 1306, affd 502 F2d 963; see, also, Termination of the Parent-Child Relationship: Should Parental I.Q. Be an Important Factor?, 1973 Law and the Social Order, vol 4, pp 865, 866, nn 83, 84.) To use these tests as a major factor in the termination of this Spanish-speaking mother’s parental rights to her child could constitute a denial of equal protection guaranteed by the Fourteenth Amendment of the United States Constitution and section 11 of article I of the New York State Constitution.
Mental illness is the other ground asserted by the petitioner for termination. Measured by the "clear and convincing” standard of proof required (Social Services Law, § 384-b, subd 3, par [g]), the testimony and proof adduced in support of this allegation is clearly deficient. No history of mental illness or hopsitalizations has been shown for this respondent mother. In fact, the only diagnosis of mental illness was made by Dr. Sandra Kaplan, petitioner’s psychiatrist. Dr. Robbins, the court-appointed psychiatrist, found no mental disorder. He concluded that her mental condition does not fall within the purview of section 384-b (subd 4, par [c]) of the Social Services Law.
Moreover, the statutory scheme in a termination proceeding based upon mental illness or mental retardation requires a showing not only that the parent is presently incapable of providing proper and adequate care for a child but also "for the foreseeable future” (Social Services Law, § 384-b, subd 4, par [c]; emphasis added). Impliedly, if it can be foreseen that with remedial and supportive services that this parent could *918 function as a mother, then termination of her parental rights is not warranted. Both the court-appointed psychiatrist (Dr. Robbins) and psychologist (Beatrice Zasofsky) testified that with supportive services and guidance this respondent could function as a mother. The psychiatrist (Dr. Kaplan) and the psychologist (Dr. Villena) who testified for the petitioner, while asserting that respondent mother’s level of mental retardation is such as to impair her functioning as a parent, failed to indicate, what, if any, effect remedial and supportive services would have upon her functioning as a parent in the foreseeable future.
As one author sadly noted: "The cases fail to give serious consideration to the proposition that willing and loving retarded parents can be taught to cope with the day-to-day demands of raising children. Low intelligence is, probably mistakenly, equated with absolute inability to learn to deal with routine problems.” (Note, "The Law and the Problem Parent: Custody and Parental Rights of Homosexual, Mentally Retarded, Mentally Ill and Incarcerated Parents”, 16 J Fam L 797, 808.) This court has given serious consideration to this proposition, and based on the evidence finds that the petitioner has failed to sustain the burden of proof by clear and convincing evidence that respondent mother is mentally ill within the meaning of section 384-b (subd 4, par [c]) of the Social Services Law.
In conclusion, this court is mindful of the comments of the Court of Appeals in Matter of Corey L v Martin L (45 NY2d 383, 392): "A termination of parental rights is a drastic event indeed, so much so that it raises questions of constitutional dimension [citations omitted].” This is particularly true since foster care has been condemned as a class-based intrusion into the family life of the poor. (For further comment on this point, see Smith v Organization of Foster Families, 431 US 816, 833.)